**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHRIS LUSBY TAYLOR; NANCY A.
PEPPLE-GONSALVES,
            *Plaintiffs-Appellants,*

                v.

STEVE WESTLY, in his capacity as
Controller of the State of
California,
            *Defendant-Appellee.*

No. 02-16511

D.C. No.
CV-01-02407-FCD

OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, District Judge, Presiding

Argued and Submitted
October 10, 2003—San Francisco, California

Filed March 29, 2005

Before: Richard D. Cudahy,* Robert R. Beezer, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Kleinfeld

*The Honorable Richard D. Cudahy, Senior United States Circuit Judge
for the Seventh Circuit, sitting by designation.

**COUNSEL**

William W. Palmer, Sacramento, California, for the appellants.

Robin B. Johansen, Remcho, Johansen & Purcell, San Leandro, California, for the appellee.

**OPINION**

KLEINFELD, Circuit Judge:

Persons whose stock was escheated to the state sued to get it back. The district court held that the Eleventh Amendment barred their claims. We disagree.

Facts.

The dismissal was for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).[1] No material disputes of fact have been asserted as to jurisdiction, and the district court acted on the basis of what the plaintiffs pleaded, so we proceed on the basis of the allegations of fact in the complaint.[2]

Although this case was filed as a class action, it never reached the point of class certification *vel non*. As it comes to us, it is by two individuals against the state controller. One, Chris Taylor, a former Intel employee, lives in England and owns 52,224 shares of Intel stock. The other, Nancy Pepple-Gonsalves, a former TWA flight attendant, lives in California, in Riverside County, and owns 7,000 shares of TWA stock.

[1]*See Broudy v. United States*, 661 F.2d 125, 128 n.5 (9th Cir. 1981).

[2]*See Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.1 (9th Cir. 2003).

Or at least they did own the stock, before the state took it away.

The state controller took Mr. Taylor's and Ms. Pepple-Gonsalves's stock as "unclaimed property." But these individuals do, in this lawsuit, claim it. The property was treated as unclaimed because for three years these two individuals did not cash dividend checks, respond to proxy notices, or otherwise communicate to the companies in which they owned stock.[3] Intel and TWA provided the State of California with lists of shareholders who were "lost" or "unknown" by these three criteria, as required by law, and issued "duplicate shareholder certificates" to the state. The Controller then sold the stock and deposited the money received in exchange into the state's general fund.

This case is about escheat. Escheat, at common law in England, formerly terminated a tenancy so that on the death of a tenant without heirs, or as a result of a tenant's felony that worked a corruption of the blood, the land escheated to the lord of the fee.[4] Title by escheat "was one of the fruits of and consequences of feudal tenure."[5] "But, as the feudal tenures do not exist in this country, there are no private persons who succeed to the inheritance by escheat; and the state steps in the place of the feudal lord, by virtue of its sovereignty, as the original and ultimate proprietor of all the lands within its jurisdiction."[6] Escheat of tangible or intangible personal property arises from the same conceptual scheme.

Traditionally, constitutional disputes about escheat are between financial institutions and state governments.[7] The

---

[3] *See* Cal. Civ. Proc. Code § 1516(b).

[4] Cornelius J. Moynihan, Law of Real Property 21 (1962).

[5] IV James Kent, Commentaries on American Law 419 (1830).

[6] *Id.* at 420.

[7] *See Standard Oil Co. v. New Jersey*, 341 U.S. 428 (1951); *Conn. Mut. Life Ins. Co. v. Moore*, 333 U.S. 541 (1948).

issues have traditionally concerned which of several potential claimant states can get the money, or whether the financial institution has a sufficient connection to the state for the state to be entitled to the money. That is about what one would expect, in a situation where the true owner of the money is dead, leaving no descendants who are aware of the asset, and the question is whether the financial institution gets the money or one of several competing state governments. Escheat is, after all, a means of dealing with money where money and property are unclaimed and the person entitled to it is dead or gone, gone to a degree that the person cannot be found and there is no other individual with a good claim.

The escheat problem, in this case, arises from a new approach used by some state governments, greatly shortening the time before which untouched property is treated as though it had been abandoned, greatly reducing or eliminating notice to the true owner, and ignoring the true owner's pleas. For example, California is taking the flight attendant's stock in her airline on the basis, basically, that she cannot be found, even while she is standing in court shouting, "Here I am! Here I am! Give me my money!" And the State of California turns a deaf ear, pretending it cannot hear her.

She is thought to be dead or gone, despite her obvious liveliness and presence, because she has not cashed a dividend check, sent a change of address to TWA, or sent in a proxy, in five years.[8] But, many companies do not pay dividends. During the relevant three-year period, Intel did not pay any dividends[9] so there were no dividend checks to cash. And TWA only paid a dividend to its preferred stockholders.[10] Even

---

[8]Cal. Civ. Proc. Code § 1516 (1990). In the case of Mr. Taylor, Cal. Civ. Proc. Code § 1516 (1992) applies and looks only at a three-year time frame.

[9]Intel 1998 Annual Report *at* http://www.intel.com/intel/annual98/summary.htm (covering ten-year span from 1989 to 1998) (last visited March 21, 2005).

[10]Trans World Airlines, Inc. 1991 Annual Report (covering three-year span from 1989 to 1991).

when dividends are paid, the dividend checks are often very small and owners of small amounts of stock may forget to cash them or may find it not worth a trip to the bank. As for changes of address, many people do not change their addresses over a three- or five-year period. As for voting their proxies, a very high proportion of shareholders do not bother,[11] because it does not make sense for them to spend an hour or two studying a proxy statement to vote their few shares, when they have neither enough stock to make a difference in the election nor enough knowledge to know what difference they would want to make.

Although state law provided for notice to shareholders and an opportunity to claim their supposedly "unclaimed property," the Controller decided that the forms of notice provided for by statute were impractical and unfunded. She decided not to mail notices to shareholders' last known addresses, and not to publish, in newspaper ads, the individual names and property being taken as unclaimed.

Neither of these plaintiffs were really hard to find, nor did they mean to abandon their property. Chris Taylor acquired his stock in Intel because he worked for Intel for a number of years. His wife was general counsel for Intel in Europe. Intel corresponds with him regarding his stock and his pension fund and knows his address. He still has his original stock certificates, but the Controller has rendered them worthless by getting duplicate stock certificates and selling the shares.

Nancy Pepple-Gonsalves worked as a flight attendant for twenty years and invested part of her salary in TWA stock. The company has at all times either known precisely where she was, as with Mr. Taylor, or had the means to readily locate her. Neither of these people were lost, and neither meant to abandon their investments. Because they retained

---

[11]Jeffrey M. Laderman, *Moneymen May Stop Deep-Sixing Proxies*, Business Week, March 20, 1989, at 142.

their original stock certificates, and were never notified of the Controller's actions, they had no reason to suspect that their investments were disappearing into the State of California's general fund. The Controller has about $2.7 billion through such escheats. Around $20 million is held as cash, after the stock is sold, to cover claims of persons who make timely claims, and the rest is deposited into the general fund.

This is, as was mentioned above, a new approach to escheat. It used to be, until the seventies, that the period of inaction before the property was deemed "unclaimed" was sixteen years. Now it has been shortened to three years. Also, until 1989, the Bureau of Unclaimed Property published the names of shareholders, whose shares were thought to be unclaimed, in newspapers in each county that listed an address for the individual. The Controller also used to maintain a staff, in the 1980's, to find owners and get their property back to them.

Now the Controller just publishes advertisements describing their general practices, under a headline "Your Money?" The text of the advertisement, in full, is in the footnote below.[12]

---

[12]"Notice of Unclaimed Property — You May Be Owed Money! The State Controller's Office has received unclaimed property belonging to over 2 million individuals and companies. This includes bank accounts, stocks, bonds, uncashed checks, and safe deposit box contents. Most accounts become unclaimed when there is no owner contact with the institution or account activity for three (3) years. Often the owner forgets the account exists, moves and does not leave a forwarding address or the forwarding address expires. This money is waiting to be claimed by its rightful owners.

　　Call 1-800-992-4647
　　STATE CONTROLLER'S OFFICE
　　Bureau of Unclaimed Property
　　P.O. Box 942850, Sacramento, CA 94250-5873
　　Hours: 8:00 a.m. to 5:00 p.m., Monday through Friday.

California Relay (Telephone) Service for the Deaf or Hearing Impaired from TDD phones: 1-800-735-2929 and ask for 1-800-992-4647.

This ad is in lieu of CCP 1531 and is in accordance with Chapter 303. Statutes of 1995."

Though the advertisement says what the criterion for taking the property is — "no owner contact with the institution or account activity for three (3) years" — it does not say what property is being taken or from whom. No names of property owners are listed. The ad says: "This money is waiting to be claimed by its rightful owners," but it does not say how long the rightful owners have to claim the money before losing it to the state.

The encouragement to claim one's money is not all it might seem. The Controller, according to the complaint, decided to publish the ads at times, such as just before holidays, when a lot of people would be away, because "her limited staff is unable to handle the large influx of calls generated by advertisements." It is especially interesting that, in a font smaller than the main text, the ad does not claim to comply with the law, but instead admits that it is "in lieu of CCP 1531." The reference is to California Code of Civil Procedure section 1531, which required publication of names and also individually mailed notices to persons with listed addresses.[13] Thus the Controller is admitting right in her ad that she is violating the law!

The Controller did not follow California's statutory directive regarding how she is supposed to take "unclaimed property." Her intentional violations of the law implicated those provisions that are reasonably calculated to give actual notice to the owners. The reason why, according to a document from the Controller's office attached to the complaint, is that she did not have the money to give the notice required by law. "Funding for both the Locator Unit [that attempted to find owners and return their property] and the publication of

---

[13]This reference is to Cal. Civ. Proc. Code § 1531 as it existed during the relevant time period between 1990 and 1994. Since 1997, Cal. Civ. Proc. Code § 1531 has been amended and no longer requires publication of names, and requires direct mailing only if the escheated account contains a social security number.

names in the newspapers was not available after 1989. In 1994, some publication funding was restored, and the Bureau began placing 'block ads' [as quoted above] in newspapers of wide circulation. In November, 1994, the 'block ad' covered unclaimed property reports from 1990 through 1993."

According to the complaint, sometimes the Controller pays people an amount she deems appropriate for their stock, and sometimes she pays nothing. Nancy Pepple-Gonsalves, the TWA flight attendant, got nothing. Chris Taylor apparently is treated by the Controller as having an "account" of about $200,000 for 1,058 shares of Intel stock, but that misses the stock splits and appreciation after she took it. According to the complaint, had the Controller not taken Mr. Taylor's stock and sold it, he would actually have had 52,224 shares worth $3,864,576.

The specific allegations in the complaint included the following:

- State law allows for property to escheat to the state only if its owners are "lost" or "unknown." But in the case of Taylor and Pepple-Gonsalves, Intel and TWA, respectively, knew where they lived or could easily find them. In fact, Intel and Taylor were in regular communication about Taylor's pension and stock.

- The state hired agents to threaten companies, including out-of-state companies, with fines and penalties, and paid its agents a percentage of the revenue generated from the seized property.

- The state failed to give any reasonable notice to those whose property it was about to seize and made no real effort to locate owners, as required by state law. It did not attempt direct-mail notice. Nor did it comply with the express statutory obli-

gation to give publication notice by publishing the names of the property owners. Instead, the Controller sometimes published generic advertisements without listing any names or details about the property to be seized. At other times, the Controller ignored altogether the need to provide publication notice. When the state did place generic ads, it purposefully placed them around the holidays and at other "times of the year that were calculated to minimize the number of members of the public who would see the advertisements." The ads themselves said that the state was publishing them "in lieu of" what the statutes required.

- California seized property over which it had no jurisdiction, including property belonging to nonresidents of California and held by non-California companies (Taylor, for example, is a resident of England, and Intel is a Delaware corporation).

Plaintiffs seek a declaratory judgment, "disgorgement and return of either their stock investment or the return of the reasonable value thereof," money damages, an injunction commanding the Controller to return their stock and to refrain from engaging in future seizures of this sort without notice, and other relief. The complaint asserts, *inter alia*, violations of the Due Process and Takings Clauses of the United States Constitution, federal securities laws, and the state Unclaimed Property Act.

The district court dismissed all the claims without oral argument on the ground that, under the Eleventh Amendment, the district court had no jurisdiction. Plaintiffs appeal. Our

review of a 12(b)(1) dismissal for lack of subject matter juris-diction is de novo.[14]

### Analysis.

**[1]** Generally, the Eleventh Amendment shields state gov-ernments from money judgments in federal courts, and from declaratory judgments against the state governments that would have the practical effect of requiring the state treasury to pay money to claimants.[15] That is why the district court dis-missed the money claims. Congress, using its authority to enforce by legislation the provisions of the subsequently adopted Fourteenth Amendment, can "abrogate" Eleventh Amendment state governmental immunity by expressing its intent to do so with sufficient clarity.[16] Generally injunctions against state officers are not barred by the Eleventh Amend-ment.[17] The presumption, as explained by the Supreme Court in *Ex parte Young*, is that no state could or would authorize a state officer to act contrary to the federal Constitution, so any such action would be ultra vires, and state sovereignty therefore cannot be offended by a federal judicial command to the state officer to conform his conduct to the Constitution in the future.[18] The district court denied relief under this *Ex parte Young* branch of Eleventh Amendment doctrine on the theory that, although prospective in form, the requested injunction was retrospective as a practical matter, in the nature of a command to pay plaintiffs money that the state owed them.

---

[14]*See Luong v. Circuit City Stores, Inc.*, 368 F.3d 1109, 1111 n.2 (9th Cir. 2004).

[15]*See Frew v. Hawkins*, 540 U.S. 431, 437 (2004).

[16]*See Quern v. Jordan*, 440 U.S. 332, 345 (1979).

[17]*Ex parte Young*, 209 U.S. 123 (1908).

[18]*Id.*

I.  Return of Seized Property

Ordinarily, the Eleventh Amendment bars a plaintiff from using a lawsuit in federal court to get money damages for wrongful conduct by state officials out of the general fund of the state government.[19] In this case, the plaintiffs sue "Kathleen Connell, in her capacity as Controller of the State of California."[20] The plaintiffs' complaint pleads that Connell acted in the course of her duties in her elected position, but in violation of the statutes that govern her performance of those duties and her constitutional responsibilities. The pleading states that some money from sales of the stock she has taken is retained in a fund she controls, and the bulk of the money is immediately deposited into the general fund of the state when she takes and sells the stock.

[2] The California statutes distinguish between "escheat" and "permanent escheat."[21] Where the property has not "permanently" escheated to the state, the state's Unclaimed Property Law sets up a custodial escheat system. The statute explicitly states that "property received by the state under this chapter shall not permanently escheat to the state."[22] It provides that the Controller must "safeguard and conserve" unclaimed property[23] in a trust fund for the interests of all parties having an interest in the property.[24]

---

[19]*See Edelman v. Jordan*, 415 U.S. 651, 665-67 (1974).

[20]Pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Steve Westly, the present Controller, has been substituted for her as defendant. We deny Appellants's request to maintain Kathleen Connell in her individual capacity, as she was named by the Appellants only in her official capacity.

[21]Cal. Civ. Proc. Code §§ 1300(c), (d).

[22]*Id.* at § 1501.5. *See also Harris v. Westly*, 116 Cal. App. 4th 214, 219 (2004); *and Fong v. Westly*, 117 Cal. App. 4th 841, 844 (2004) (explaining that the Unclaimed Property Law does not operate a true escheat because the state holds the property as a custodian until the property's rightful owner can claim the property).

[23]Cal. Civ. Proc. Code § 1365.

[24]*Id.* at § 1313.

**[3]** The state statutes unambiguously provide that the Controller and even the Treasurer holds property he or she takes as "unclaimed" in trust. Traditional trust language is used:

> The care and custody of all property delivered to the Treasurer or Controller pursuant to this title is assumed by the State for the benefit of those entitled thereto, and the State is responsible for the payment of all claims established thereto pursuant to law, less any lawful deductions.[25]

This is language establishing a custodial trust. Thus, to the extent that the funds remained in the state's special account, they were being held in trust, rather than being in the state treasury.

Before California escheated property is "permanently" escheated, it is like a car that is towed and held in an impound lot. The car is in the custody of the impounding government, but it is held for its owner, if one turns up. Even if the Controller has paid money over to the general fund of the state, she is required by the California statutes to order it "retransferred" from the general fund back to the "Unclaimed Property Fund" "if it is subsequently determined that such money or . . . property is not, in fact, permanently escheated."[26]

**[4]** The Controller's obligation to order transfer from the Treasurer, if money was deposited in the general fund but is subsequently found not to be permanently escheated,[27] plainly establishes that the trust continues, even after the Controller has transferred the money to the general fund. Thus the money, even if in the general fund, is not held free and clear by the State of California, but subject to retransfer if the property is later found not to be permanently escheated. The Con-

---

[25]*Id.* at § 1361.

[26]*Id.* at § 1347.

[27]*Id.*

troller may sell escheated securities "whenever, in his opinion, such action on his part is necessary or will tend to safeguard and conserve the interests of all parties, including the State, having any vested or expectant interest in the property."[28] This sale provision plainly establishes that even after the Controller has taken securities into her possession and sold them, as she did with Mr. Taylor's and Ms. Pepple-Gonsalves's Intel and TWA stock, she must "safeguard and conserve" the interests of parties with vested rights. That too implies that she holds the proceeds in trust. She has to deposit the sale proceeds in her Unclaimed Property Fund "in the name of which the property sold . . . was held" and the money "shall be held for the benefit of those entitled to claim" it.[29] Unrestricted title does not pass to the state unless and until the property is "permanently escheated."[30]

[5] The complaint does not establish that a permanent escheat determination has been made. Nor, if the averments of the complaint are true, could it have been made. The California procedure for making such a determination has not yet been followed. The procedure requires the Controller to file suit in superior court, and publish repeated notice in newspapers, which notice must include "the name of the owner or claimant and his last known address."[31] A judgment then establishes that title has passed to the state by escheat.[32] But even that judgment does not establish "permanent" escheat. The escheat becomes "permanent" only "[u]pon the expiration of five years after the date of entry of the judgment."[33]

_____

[28]*Id.* at § 1371.

[29]*Id.* at § 1390.

[30]*Id.* at § 1300(d).

[31]*Id.* at § 1410.

[32]*Id.*

[33]*Id.* at § 1430.

Only then may the Controller order the property transferred to the general fund.[34]

[6] The State of California's sovereign immunity applies to the state's money. Money that the state holds in custody for the benefit of private individuals is not the state's money, any more than towed cars are the state's cars. Thus, where a permanent escheat determination has not yet been made, the state's Eleventh Amendment immunity from suit against it for damages payable from its treasury has no application to escheated property and sales proceeds from escheated property, whether held by the Controller or the Treasurer.

The case at bar differs from *Papasan v. Allain*.[35] There, schools sued for money, arguably held in trust for the schools, that the new state of Mississippi had lost.[36] Mississippi had invested the proceeds from sale of Chickasaw Indian Nation "lieu lands" in the state's extensive railroad network that was destroyed a decade later during the Civil War.[37] The lawsuit, over a century later, was for this alleged breach of fiduciary duty.[38] The distinction between this case and *Papasan* is that the suit in *Papasan* was, in substance, for damages because the corpus of the trust was gone with the wind.[39] Thus, because of the loss of the corpus, any money recovery was coming directly from state resources.[40] Here, by contrast, the corpus still exists and is available for return.

Because the plaintiffs' money is held in a custodial trust, this case is in line with the circumstances in *United States v.*

[34]*Id.* at § 1431.

[35]*Papasan v. Allain*, 478 U.S. 265 (1986).

[36]*Id.* at 274.

[37]*Id.* at 271-72.

[38]*Id.* at 274.

[39]*Id.* at 280-81.

[40]*Id.* at 281.

*Lee*,[41] where the claimant sued for a return of his own property, which was not property of the government. A descendent of General Robert E. Lee sued for the return of land (the site of Arlington National Cemetery) that he claimed was improperly taken from his family by the federal government. The Supreme Court held that sovereign immunity did not bar the claim. The Court's rationale was that this was not a suit in which the plaintiff sought the government's property as a remedy. Rather, it was a suit in which the plaintiff merely sought possession, which was wrongfully denied him by agents of the government. This distinction meant that the case was truly one against the possessor, the government agent, and not against the sovereign, despite the fact that the agent purported to possess on behalf of the sovereign.[42]

[7] While reading *Lee* in isolation suggests that suits for return of property are not barred by sovereign immunity, subsequent case law, in the 120 years since *Lee* was decided, tempers its force. The most explicit limiting of *Lee* came in *Malone v. Bowdoin*.[43] The facts of *Malone* were in many respects like those of *Lee*. The plaintiffs brought an action of ejectment against an officer of the Forest Service, seeking to recover possession of land that the plaintiffs claimed they owned. The Court recognized that its opinions varied widely with regard to the scope of *Lee*'s exception to sovereign immunity.[44] Drawing from an earlier case that sought to reconcile this "tangle" of precedent, the Court laid down the following statement of law, which it explicitly described as a limitation of *Lee*:

> [T]he action of a federal officer affecting property claimed by a plaintiff can be made the basis of a suit for specific relief against the officer as an individual

---

[41]*United States v. Lee*, 106 U.S. 196 (1882).

[42]*See id.* at 208-09, 210-11.

[43]*Malone v. Bowdoin*, 369 U.S. 643 (1962).

[44]*Id.* at 646 & 646 nn.6, 7.

only if the officer's action is "not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void."[45]

Thus, *Malone* preserved the force of *Lee* for suits in which a plaintiff asserts a claim for return of his property, but it did so only if the claim falls into one of two categories: (1) it must be based on the public official having acted beyond his statutory authority (the "ultra vires exception"[46]) or (2) the plaintiff's theory must be that the action leading to the government's possession of the property was constitutionally infirm.[47] Later cases by both the Supreme Court and this court validate these categories.[48]

Because we have interpreted plaintiffs' claims as ones for return of property, the threshold requirement for putting this case within the *Lee-Malone* line of cases applies. Turning to the specific requirements from *Malone*, we also conclude that plaintiffs' suit satisfies both of the ways in which a claim for return of one's property can fall outside the purview of sovereign immunity. That is, plaintiffs' allegations are that the Controller acted ultra vires by violating clear statutory restrictions and that, regardless of her authority, the manner in

---

[45]*Id.* at 647 (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 702 (1949)).

[46]*Washington v. Udall*, 417 F.2d 1310, 1316 (9th Cir. 1969).

[47]*Malone*, 369 U.S. at 647.

[48]*See, e.g.*, *Fla. Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 689 (1982) (plurality) ("These cases make clear that the Eleventh Amendment does not bar an action against a state official that is based on a theory that the officer acted beyond the scope of his statutory authority or, if within that authority, that such authority is unconstitutional."); *Aminoil U.S.A., Inc. v. Cal. State Water Res. Control Bd.*, 674 F.2d 1227, 1233 (9th Cir. 1982) ("Thus, a state court may entertain an action against an officer . . . if the officer has exceeded his statutory or constitutional authority.").

which she acted violated due process, making her actions constitutionally infirm.

In interpreting the first of *Malone*'s two ways in which a claim can avoid the effects of sovereign immunity, we have said that "[a] simple mistake of fact or law does not necessarily mean that an officer of the government has exceeded the scope of his authority," and "[o]fficial action is still action of the sovereign, even if it is wrong, if it 'does not conflict with the terms of the officer's valid statutory authority.' "[49] In contrast, "action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property), that is beyond the officer's statutory authority is not action of the sovereign; a suit for specific relief against the officer is not barred by the Eleventh Amendment."[50] As we have put it when interpreting *Malone*'s rule, allegations that an officer violated "a plain legal duty" can take the officer's actions outside the scope of her delegated responsibilities.[51] Relevant to this inquiry is whether the statutory authority includes "words of discretion" with regard to the challenged action.[52]

**[8]** As outlined above, plaintiffs assert many problems with the way in which the Controller took their property. If true, many of these obligations are arguably mistakes or abuses of discretion, but not violations of the scope of the Controller's statutory authority. We need not parse each of plaintiffs' allegations, however, for some of them unquestionably assert violations that, if true, would clearly put the Controller's actions beyond her statutory authority. For example, plaintiffs assert that they and their stock were wholly outside the escheat scheme because they were never actually "lost" as the statute

---

[49]*Aminoil*, 674 F.2d at 1234 (internal editing omitted) (quoting *Larson*, 337 U.S. at 695).

[50]*Treasure Salvors*, 458 U.S. at 696-97 (internal quotation and citation omitted).

[51]*Udall*, 417 F.2d at 1316.

[52]*Id.*

requires.[53] Also, at least with regard to Mr. Taylor, the complaint asserts that he was not a resident of California, and that his property was therefore outside the jurisdiction of the escheat statute. At this stage of the proceedings, we are, of course, in no position to assess the validity of these charges. And we intimate no opinion on the merits of the allegations. They are, however, the type of allegations that qualify a claim for the ultra vires thread of the *Lee-Malone* exception to sovereign immunity.

[9] As for the other category of cases *Malone* addressed, the plaintiffs' procedural due process claim qualifies for the exception to sovereign immunity for that reason as well. Because this is a constitutional claim for the return of property taken and held in custody by the state, *Malone*'s second exception removes the due process claim from the effects of sovereign immunity. For this claim, plaintiffs need not even show that the Controller exceeded the scope of her statutory authority. Even if her actions were "within those powers" that the statute gives her, sovereign immunity is unavailable "if the powers, or their exercise in the particular case, are constitutionally void."[54] Assuming that the plaintiffs' allegations are true, as we must, the Controller failed to give "notice reasonably calculated, under all the circumstances, to apprise inter-

---

[53]*See* Cal. Civ. Proc. Code §§ 1510, 1516. The complaint states with regard to Mr. Taylor that "[t]o this day, Intel continues to correspond with Chris Lusby Taylor regarding his stock and his pension fund and the company knows precisely where he lives." With regard to Ms. Pepple-Gonsalves, it asserted that "the company at all times knew precisely where Nancy A. Pepple-Gonsalves lived in the State of California, or could readily have located her using her Social Security Number." More generally, the complaint also states that "[t]he Controller takes these actions though the individual is known to the company and a list of the known owners of the stock is provided to the Controller that includes, in nearly every case, the stockowners' addresses, taxpayer and social security numbers."

[54]*Malone*, 369 U.S. at 647 (internal quotation marks omitted).

ested parties" of the fact that their property was being taken and sold.[55]

**[10]** Thus, plaintiffs' claims meet the requirements of the *Lee-Malone* exception to sovereign immunity. The plaintiffs seek return of their own property, rather than to gain ownership of government property. They allege actions that would fall outside the scope of the Controller's statutory authority to such an extent as to be ultra vires. California did not and could not authorize its officer to take people's property without notice and in the absence of any connection to the State of California.

The state invokes *Edelman v. Jordan*[56] as a bar to plaintiffs' suit. The argument is that because the state sold the stock it took from the plaintiffs, any recovery would come in the form of money from the state, which *Edelman* prohibits. But *Edelman* has no application here. In *Edelman*, the plaintiffs unquestionably sought money that belonged to the government, but to which the plaintiffs asserted an entitlement. They did not seek reinstatement of possession of property they owned. In this case, there is no dispute that the plaintiffs own the stock that the state took. The statutes plainly establish that the state only holds the property on behalf of the true owners and not as its own, because the property has not "permanently" escheated. As discussed above, the escheat is only custodial and is "subject to the right of claimants to appear and claim the escheated property."[57] In *Lee*, there was a dispute as to who actually owned the property, the government or the plaintiff. Here, there is not even a dispute. Properly viewed, the claim is for return of property held in trust for the owners, not for compensation for property full title to which has passed to the state. This makes the claim one for return under

---

[55]*See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

[56]*Edelman*, 415 U.S. 651.

[57]Cal. Civ. Proc. Code § 1300(c).

*Lee* and *Malone*, not one for compensation from the state's general fund under *Edelman*.

II.   Prospective Relief

**[11]** The state custodial escheat scheme establishes as well that prospective relief genuinely distinguishable from a damages award is available. An injunction may order the Controller to exercise his or her power under Cal. Civ. Proc. Code § 1347 to order the Treasurer to remit the money back to the Controller for redeposit in the Controller's Unclaimed Property Fund.

The district court was correct in concluding that, to the extent the plaintiffs sought a declaratory judgment that Mr. Taylor's and Ms. Pepple-Gonsalves's shares of stock were unconstitutionally taken from them, and an injunction that the state pay them money to compensate them, the claims would not fall within the *Ex parte Young* prospective relief exception to the Eleventh Amendment. While some may describe "this retroactive award of monetary relief as a form of 'equitable restitution,' "[58] such claims are "in practical effect indistinguishable in many aspects from an award of damages against the State."[59]

But not all of the plaintiffs' claims are retroactive requests for money. Plaintiffs' claims for prospective relief include some that really are entirely prospective. The complaint says that the Controller "is unable to locate the proceeds" from the sale of Ms. Pepple-Gonsalves's TWA stock and lists her shares "as permanently misplaced and unpayable." Her claim for an accounting is genuinely prospective, because the court's supervision of a full accounting may determine that the state still has her shares, has not sold them, and is in a position to return them. And because the Controller has statu-

---

[58]*Edelman*, 415 U.S. at 668.

[59]*Id.*

tory authority to order the Treasurer to refund money not permanently escheated, genuinely prospective relief can direct her to issue such an order.

More broadly, the complaint alleges that the Controller as a matter of regular practice purports to take securities and money from people's bank accounts by escheat without providing them with the sort of notice required by state law, or any sort of notice reasonably calculated to inform them that the state is taking their property. The Controller's own advertisement admits that it is not the notice required by state law, and is instead something "in lieu" of lawful notice. And the Controller has conceded, according to the complaint, that she discontinued trying to find owners, or even listing their names in the published notices of escheat, because she lacked funding, not because the law does not require individualized notice. There is no "lack of funding" exception to the Due Process Clause.

[12] If these facts turn out to be true, prospective relief may be available, both for these two plaintiffs to protect whatever assets they still have and, more broadly, to protect remaining members of the plaintiff class if class certification is achieved. Aside from any monetary relief, the district court could declare the notice practices of the Controller unconstitutional and enjoin the Controller to conform to the state statute on notice, or to whatever other standards were determined to be appropriate. Such relief would fall within the prayer of the complaint and within the *Ex parte Young* exception to the Eleventh Amendment bar.

III.   The Takings Claim

We need not decide the issue of sovereign immunity in the context of a takings claim, since we have already decided that plaintiffs' property has not been taken at all, but has merely been held in trust for them by the Controller. The plaintiffs' suit is not against the state treasury and is merely a suit for the

return of their property. Were the money permanently escheated to the state, and therefore no longer held in trust for the plaintiffs, we would be presented with the sovereign immunity question in the context of a takings claim. Since that has not occurred, we express no opinion on whether the Eleventh Amendment would bar such a takings claim against the state.

### Conclusion.

**[13]** Because the plaintiffs seek genuinely prospective relief, and because the funds they seek are held by the state as custodian in trust for them rather than as the state's own funds, much as a municipality holds a car towed from an expired parking meter, the complaint should not have been dismissed under the Eleventh Amendment for lack of jurisdiction. The judgment is vacated and the case is remanded for proceedings consistent with this opinion.

VACATED AND REMANDED.