# United States Court of Appeals
## For the First Circuit

No. 10-2507

GLADYS GARCÍA-RUBIERA; DOMINGO A. CORPORAN-SUÁREZ; ADALBERTO
RODRÍGUEZ; LOURDES MATOS; JOSÉ R. MALDONADO; JOSÉ PÉREZ-CANABAL;
MANUEL MOLINA-GODÍNEZ; DAVID CASTRO; ADALBERTO AVILÉS; JORGE
PLARD; LAURA PLARD-OCASIO; GINOVA TORO-MORALES; NOEMÍ
VALENTÍN-MARRERO,

Plaintiffs, Appellants,

v.

LUIS G. FORTUÑO, Governor; JUAN CARLOS PUIG-MORALES,
Treasury Secretary,

Defendants, Appellees,

JUAN ANTONIO FLORES-GALARZA; SILA MARÍA CALDERÓN,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

A.J. Amadeo Murga for appellants.
Miguel A. Rangel-Rosas, with whom Angel E. Rotger-Sabat,
and Maymí, Rivera & Rotger, P.S.C., were on brief, for appellees.

December 2, 2011

**LYNCH**, **Chief Judge**.  At stake in this case are the due process rights of privately-insured motor vehicle owners in Puerto Rico to over $100 million in insurance payments, which have been collected by the Commonwealth, and are owed back as reimbursement to these vehicle owners, but which have not been repaid and have been used instead for the Commonwealth's general budget.

Puerto Rico law requires all motor vehicle owners to pay for compulsory, state-issued automobile insurance when they purchase or renew their vehicle registrations, even if they have obtained equivalent private insurance, with limited exceptions. P.R. Laws Ann. tit. 26, § 8051 et seq.  As a result, many vehicle owners who have already paid for private insurance must pay again for the same coverage through the Commonwealth.  By law, these privately-insured vehicle owners ("insureds") who pay twice for insurance coverage are entitled to reimbursements of the duplicate, state payments.  Id. § 8055(n).  For two years after the date of payment, insureds may seek reimbursement from their private insurers.  However, a great deal of the money owed to insureds is not returned during this two-year period.  Although there is no doubt that insureds have a property interest in the duplicate payments, no statute or regulation provides notice to insureds of how to obtain reimbursement during this two-year period from their respective insurers, and apparently only some insurers provide their insureds with notice of how to obtain reimbursements.

-2-

By statute, every two years the Commonwealth transfers to itself the large pool of unreimbursed duplicate payments that have accumulated to the private insurers. Act No. 230 of Sept. 11, 2002, § 2 (codified at P.R. Laws Ann. tit 26, § 8055(*l*)). The Commonwealth holds this money in trust for the insureds for another five years, during which insureds can seek reimbursement directly from Puerto Rico's Treasury Department. Id. At the end of the five year period "these funds . . . become property of the Commonwealth of Puerto Rico and . . . pass to the General Fund of the Commonwealth Treasury." Id. However, the governing statute does not itself set up a procedure for reimbursement or tell insureds where or how to find such procedures. The statute only requires Puerto Rico's Secretary of the Treasury to issue a procedure for reimbursement.

The Secretary of the Treasury has established such a procedure, but has failed to give insureds notice of the contents of that procedure or where to find it. In fact, insureds will not find it unless they go in person to the proper office of government and make an "appropriate request" for a copy of the regulation.

In addition to receiving no notice about the Commonwealth's procedures for reimbursement, insureds receive no individual notice that their duplicate payments have been transferred from their private insurers to the Commonwealth, or that they may apply directly to the Secretary of the Treasury for

reimbursement after this transfer. They also receive no individual notice that their duplicate payments will escheat to the Commonwealth after five years, and so be permanently lost to them.

A class of insureds owed reimbursement challenged the Commonwealth's compulsory insurance scheme in both Puerto Rico's courts and federal court. In this federal suit, the insureds claim, inter alia, that the compulsory insurance scheme violates the fundamental requirements of procedural due process. The Puerto Rico suit, which has been stayed in favor of this suit, makes the additional claim that the Commonwealth has breached its fiduciary duties as trustee of the duplicate premiums on behalf of insureds.

We agree that the Commonwealth of Puerto Rico has violated the notice requirements of the Due Process Clause and direct entry of a declaratory judgment and injunctive relief to that effect. We reject plaintiffs' remaining federal claims. The question of whether the Commonwealth has violated its fiduciary duties to plaintiffs under Puerto Rico trust law remains before the Puerto Rico courts.

I.

A.      Background

In 1995, Puerto Rico passed Law 253, which requires all motor vehicles traveling on public roads to obtain liability insurance. P.R. Laws Ann. tit. 26, § 8051 et seq. Pursuant to Law 253, the owners of such vehicles are required to purchase either

the Commonwealth's liability insurance plan or an equivalent private insurance plan. Thus, at the time they acquire and each subsequent year when they renew their vehicle registrations, vehicle owners must either pay premiums (of $99 for private and $148 for commercial vehicles) to the Commonwealth, id. § 8053(a), or opt-out of the Commonwealth's insurance plan by using the appropriate procedures to present proof of private insurance, id. § 8061(a).

Law 253 also created the Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio ("JUA") to administer the Commonwealth's insurance plan. Id. § 8055. Composed of and operated by Puerto Rico's largest private insurance companies, JUA insures vehicle owners who buy the Commonwealth's insurance product. Id. § 8055(b). Periodically, the Commonwealth remits to JUA the insurance premiums paid in by vehicle owners, which JUA then uses or distributes among its member companies. Id. § 8055(c), (e), amended by Act 201 of Dec. 29, 2009, art. 4.

The Commonwealth insurance option provides only minimal coverage to vehicle owners (initially $3,000, but later increased to $4,000, worth of coverage for property damage to other vehicles); thus, many drivers obtain private liability insurance for more complete coverage. Id. § 8052(j), amended by Act 201 of Dec. 29, 2009, art. 2. Under Law 253, drivers who obtain private insurance with coverage "similar to or greater than that of the

compulsory liability insurance" are not required to pay for state insurance on top of their private insurance, and may opt out of the state insurance option.  Id. § 8061.

Puerto Rico's Insurance Commissioner has enacted varying procedures over the years designed to help these privately-insured vehicle owners avoid paying for both private and state insurance, but, in fact, a substantial percentage of privately-insured vehicle owners have not utilized these procedures successfully and so have been required to pay the state premium on top of their private insurance.[1]  In 2000, for example, only one-third of privately-insured vehicle owners successfully avoided paying the state

---

[1]  In the first year of the scheme's operation, every vehicle owner was required to purchase state insurance regardless of whether he or she had also purchased adequate private insurance. In later years, millions of privately-insured vehicle owners have purchased both options.  A variety of reasons exist for why privately-insured vehicle owners also purchase the state option.

Initially, the Insurance Commissioner required JUA to issue to these insureds a check in the amount of the requisite state premium made payable to the Secretary of the Treasury.  See P.R. Ins. Comm'r, Regulation No. 5737 (Dec. 30, 1997).  However, this process was rescinded in favor of the current method, by which insureds are automatically charged for the state insurance when they renew their registration unless they present a JUA-issued Certificate of Compliance certifying their private insurance.  See Amendment to Regulation No. 5737 (Sept. 14, 2000).  These certificates must be ordered from one's private insurance company after the purchase of private insurance but well in advance of the state registration or renewal date.  Id.  This timing is critical: if an insured's private policy is up for renewal too close to or after the insured's vehicle registration date, he or she will not be able to obtain a certificate and will be forced to pay the state premium.  Similarly, if an insured is late in paying his or her private insurance premium or makes any changes to the policy, he or she may be required to pay the state premium.

premium, and the remaining two-thirds had to pay for both private and state insurance.

By law, when an insured pays twice, he or she is entitled to a reimbursement of the state premium fee. The Insurance Commissioner has promulgated regulations to this effect which direct private insurers to first reimburse their insureds who pay twice, and then seek their own reimbursement from JUA. However, the Commissioner's regulations do not establish a uniform procedure for reimbursement or instruct insureds on precisely how to obtain reimbursement, but merely indicate that the insurance companies may establish their own internal reimbursement procedures.

These internal procedures for reimbursement vary from one insurer to the next. Significantly, the Insurance Commissioner's regulations instruct insurers to reimburse insureds where "the insured provides evidence that the payment was made [to the Commonwealth]," Amendment to Regulation No. 5737, art. 5(a) (Sept. 14, 2000), but do not further delineate what constitutes this evidence of payment, and do not require insurers to notify their insureds of the proper procedures for proving payment or for obtaining reimbursements in general. As a consequence, many insureds (in some years, a majority of insureds) do not receive their reimbursements from their insurers and their duplicate payments simply remain in the custody of JUA.

The sums JUA has accumulated from this state of affairs are truly enormous. By 2000, just three years after Law 253 went into effect, see Act 253 of Dec. 27, 1995, § 16, JUA had accumulated $72 million worth of duplicate premiums which had not been reimbursed, a figure representing 42% of the total amount that should have been reimbursed by insurers to their insureds. Of this $72 million, $24 million was owed to insureds who had made duplicate payments that year, but the remaining $42 million represented a backlog of unreimbursed payments from the previous two years. By 2001, this sum had grown to almost $92 million.

By law, JUA is required to keep all duplicate premium payments separate from other funds in a special "Reserve" account. Each year, JUA calculates how much money to place in this Reserve account by estimating what percentage of the total number of premium payments received will be "claimed" as duplicate payments by vehicle owners who are privately insured but who end up paying twice. Typically, JUA estimates that 13% to 15% of the total number of premium payments received each year are in fact duplicate payments made by privately-insured vehicle owners.

In most years, fewer insureds claim reimbursements than expected. JUA thus designates some portion of the Reserve account as "excess," or money that will never be claimed by insureds. In 2001, for example, JUA estimated that of the $73 million in the

Reserve account, somewhere between $8 and $10 million would never be claimed by insureds and thus constituted "excess" funds.

JUA's accumulation of these large, unreimbursed sums did not go unnoticed. In 2002, the Legislature of Puerto Rico enacted Law 230, which directed JUA to transfer all of the funds accumulated in the Reserve account as of December 31, 2001 -- a sum of approximately $73 million -- to the Secretary of the Treasury, and to repeat this transfer every two years thereafter. Act No. 230 of Sept. 11, 2002, § 2. The Law's Statement of Motives explained, "during the existence of [JUA], <u>certain funds have been accumulated to it that do not belong to it</u>. . . . [I]t is of greater benefit to the public interest in general to immediately transfer those funds to the . . . custody of the Department of the Treasury." <u>Id.</u>, Statement of Motives (emphasis added).

Pursuant to Law 230, the Secretary of the Treasury is required to hold the transferred funds "as trustee" for five years, after which, any remaining funds that have not been reimbursed to insureds escheat to the Commonwealth.[2] P.R. Laws Ann. tit. 26, § 8055(*l*). Law 230 also states, without elaborating further: "The Secretary of the Treasury shall establish a procedure for processing the reimbursement request from any person alleging a

_____

[2] Under a provision of Law 230 challenged by plaintiffs in an earlier phase of this case, the Commonwealth also gained immediate title over any interest accrued to those funds transferred from JUA to the Treasury Department. <u>García-Rubiera</u> v. <u>Flores-Galarza</u>, 516 F. Supp. 2d 180, 197 (D.P.R. 2007).

right to the retained funds." Id. Law 230 does not require the Secretary of the Treasury to give notice of that procedure to the insureds.

In 2003, the Secretary of the Treasury formulated Procedure 96, under which insureds may seek reimbursement directly from the Treasury Department once JUA has transferred the funds there. Thus, after making a duplicate payment, an insured has two years in which to submit a reimbursement request directly to his or her insurer; if the insured is unsuccessful in securing reimbursement during this period, he or she has five years in which to seek reimbursement from the Treasury Department.[3]

Under Procedure 96, a claimant must obtain and fill out various forms and send these, as well as the following attachments, to the Secretary of the Treasury: (1) a copy of the motor vehicle license for which the reimbursement is being claimed; (2) a copy of the insurance policy for each year claimed; (3) certification from

---

[3] Intervenor Attorney General of Puerto Rico argued on appeal that the Insurance Commissioner's regulations should be interpreted to permit insureds to obtain reimbursements directly from their private insurers even after their duplicate payments have been transferred by JUA to the Treasury Department. The Attorney General's stated position in this case is vigorously disputed by the parties and was the subject of much confusion at oral argument. Our conclusion does not turn on this point, but we note that the Attorney General's interpretation is not the only interpretation -- and not necessarily the most natural interpretation -- of the regulations. The inordinate confusion over this point is further evidence of the inadequacy of the Commonwealth's notice to insureds of the procedures for reimbursement.

the insurance company of payment of the policy for each year claimed; (4) certification that the claimant has not been reimbursed; and finally, (5) verification that the applicant does not have any tax debts with the Treasury Department. P.R. Dep't of Treasury, Procedure 96 (Apr. 1, 2003). If the claimant is a private insurance company seeking reimbursement, it must additionally attach certified copies of each insurance policy for which it is claiming, certification that it has not yet received reimbursement from JUA for each policy claimed, and verification that it does not have any tax debts outstanding with the Treasury Department. Id.

The parties have not disputed that Procedure 96 was promulgated pursuant to Puerto Rico's Uniform Administrative Procedure Act (UAPA). Under the UAPA, once the Treasury Department finalizes Procedure 96, it is required to forward the regulation to the Secretary of State for approval. P.R. Laws Ann. tit. 3, §§ 2128(a), 2131. If approved, the Secretary of State must "publish in two newspapers of general circulation a summary of [the regulation]," which includes "its number, effective date and the agency that approved it." Id. § 2128(d) (emphasis added). Subsequently, the Secretary of State must keep in his office "a

permanent file of [the regulation] for public inspection."[4] Id. § 2130.

Thus, unlike federal regulations, which are published in multiple legal databases available both in print and for free online, under the Commonwealth's application of the UAPA in this case, the only way to obtain a full copy of Procedure 96 is to go to the Secretary of State's office, in person, and place a request to inspect the specific regulation. Even the UAPA's "publication" requirement, as applied to Procedure 96 in this case, requires only that a summary be published one time in two newspapers, a summary which need only include the regulation's number, date, and agency of issuance. Id. § 2128(d).

Under the Treasury's trusteeship, reimbursements to insureds slowed to a trickle. The Secretary of the Treasury reimbursed just $500,000 in the first year of the administration of the trust. By the summer of 2010, the Secretary of the Treasury

---

[4] Under the original UAPA, enacted August 12, 1988, the requirement that the Secretary of State retain a copy of each regulation in his or her office for public inspection was the extent of the Act's filing requirement. In 2008, the Act was amended to additionally require the Secretary of State to "establish and keep, permanently, in the webpage of the Department of State over the Internet, a copy of all regulations filed therewith for public access and inspection . . . free of charge and available in a format easily accessible for the public." P.R. Laws Ann. tit. 3, § 2130 (2009). The law is unclear as to whether the internet publication requirement is retroactive to regulations issued prior to July 16, 2008; however, the Attorney General of Puerto Rico has represented in its brief -- and a search of the Secretary of State's online collection of regulations confirms -- that Procedure 96 is available only in hard copy in the Secretary of State's office.

had reimbursed a total of $9 million in duplicate payments. Meanwhile, as of the last accounting in 2009, the Treasury Department has received approximately $157 million in duplicate payments from JUA.

The difference has been used to supplement the Commonwealth's general budget, and the Commonwealth has not hesitated to use the funds for its own purposes both before and after the funds have officially escheated. As early as 2002, when the Department of the Treasury acquired the first installment of $73 million in duplicate payments, it estimated that of this amount, only $20 million would ever be claimed by insureds in reimbursements (JUA had assessed this sum at $63 million), and promptly transferred the balance of $53 million in "excess" funds to the Commonwealth's budget for fiscal year 2001-2002, which, at that time, was running a deficit of approximately $200 million.

Two years later, with the Treasury having reimbursed just $500,000 of the $20 million initially reserved for reimbursements, the Legislature passed Act 414, which permitted the Secretary of the Treasury to transfer the remainder of that $20 million to the Commonwealth's 2004-2005 budget, less another $500,000 for reimbursements. Act 414 of Sept. 22, 2004 (codified at P.R. Laws Ann. tit. 26, § 8055(*l*)). Act 414 required that in the case the sum of $500,000 proved insufficient to cover reimbursement claims made prior to the next transfer from JUA, funds for reimbursement

should be taken out of the Commonwealth's General Fund and Budgetary Fund.  <u>Id.</u>

In 2007, the first of the duplicate premiums transferred by JUA to the Treasury escheated to the Commonwealth; additional funds escheated in 2009, and more are scheduled to escheat at the end of this year.  All told, the Commonwealth has obtained title by escheat to almost 95 percent of the duplicate premiums transferred under Law 230.

B.      <u>Procedural History</u>

Law 253 and its amendments have produced extensive litigation.  This court has heard three other cases[5] concerning the Law and its amendments in addition to the present litigation and its companion case,[6] and the courts of Puerto Rico have heard additional cases.  In the present case, plaintiffs appeal to this court from the district court's grant of defendant's motion for summary judgment, entry of judgment for defendant, and denial of plaintiffs' summary judgment motion.  <u>García-Rubiera</u> v. <u>Fortuño</u>, 752 F. Supp. 2d 180 (D.P.R. 2010).

---

[5]     <u>See Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio</u> v. <u>Juarbe-Jiménez</u>, 659 F.3d 42 (1st Cir. 2011); <u>Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio</u> v. <u>Flores-Galarza</u>, 484 F.3d 1 (1st Cir. 2007); <u>Arroyo-Melecio</u> v. <u>Puerto Rican Am. Ins. Co.</u>, 398 F.3d 56 (1st Cir. 2005).

[6]     <u>Colón-Rivera</u> v. <u>Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio</u>, No. 11-1148 (1st Cir. argued Sept. 8, 2011).

-14-

Plaintiffs filed their complaint in this case in February, 2002 as an action under 42 U.S.C. § 1983. As amended, plaintiffs' complaint sought the following relief: (1) a declaratory judgment that Law 230 and its amendments are unconstitutional under the Takings and Due Process Clauses, (2) reimbursement from the Commonwealth of their duplicate premiums with accrued interest, (3) injunctive relief to prevent the continued transfer and escheat of funds to the Commonwealth, and (4) damages from the Governor of Puerto Rico and the Secretary of the Treasury in their personal capacities.[7]

The district court entered an order dismissing the case without prejudice as premature in 2004. See García-Rubiera v. Fortuño, No. 3:02-cv-01179 (D.P.R. Feb. 11, 2004). On a Rule 60(b) motion, the court heard additional motions in the case, at which time plaintiffs moved for class certification and for a preliminary injunction, and defendants moved to dismiss. On August 30, 2007, the district court granted the defendants' motion to dismiss with respect to plaintiffs' individual capacity claims for damages, and denied plaintiffs' motions with respect to all their claims, with the exception of their request for a preliminary injunction against any further deposit into Puerto Rico's General Fund of the interest

---

[7] In 2001, plaintiffs filed a similar, but broader, action in the Puerto Rico court of first instance, which has been stayed pending the resolution of this case. García-Rubiera v. Asociación de Suscriptores Conjunta del Seguro de Responsabilidad Obligatorio, No. KDP01-1441 (P.R. Gen. Ct. of J. Cir. Mar. 16, 2011).

-15-

accrued to the duplicate premiums, which the court granted. García-Rubiera v. Flores-Galarza, 516 F. Supp. 2d 180, 197-98 & n.20 (D.P.R. 2007).

The district court rejected all of plaintiffs' constitutional claims on their motion for a preliminary injunction with respect to the duplicate premiums themselves. The court held that plaintiffs' takings claim for the duplicate payments was not ripe because plaintiffs had failed to utilize Procedure 96 to retrieve their money, and that, while ripe, plaintiffs' due process claims failed because plaintiffs did not demonstrate either that "available remedies under Commonwealth law are inadequate to redress any deprivation resulting from the transfer of the Duplicate Premiums to the Secretary," or that Procedure No. 96 is "onerous." Id. at 196.

In 2009, this court reversed the district court in part, affirmed in part, and remanded for further proceedings. García-Rubiera v. Calderón, 570 F.3d 443 (1st Cir. 2009). We held, under our circuit precedent, that plaintiffs' takings claims were ripe despite their failure to utilize state procedures to reclaim their money, id. at 453-54 (citing Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores-Galarza, 484 F.3d 1, 19 (1st Cir. 2007)), but see Downing/Salt Pond Partners v. R.I. & Providence Plantations, 643 F.3d 16, 26 (1st Cir. 2011), cert. denied, 2011 WL 3794357 (Oct.

-16-

31, 2011), and remanded for further consideration of plaintiffs' takings claims.

We also held that plaintiffs retained a property interest in the transferred duplicate premiums sufficient for purposes of procedural due process. Id. at 455. Finding the district court had failed to directly address plaintiffs' due process claim, id., we remanded for further consideration of their claim, and for a specific determination as to whether the transfer of funds constituted a "deprivation" sufficient to require notice under the Due Process Clause, id. at 458.[8]

On remand, plaintiffs moved for summary judgment on their constitutional claims. The district court denied their motion in full, holding that Law 230 did not constitute a sufficient deprivation as to require notice under the Due Process Clause, García-Rubiera, 752 F. Supp. 2d at 186-88, and further, that the transfer of funds did not amount to a taking for which insureds were entitled to just compensation, id. at 188-89. The court denied plaintiffs relief under substantive due process, finding that Law 230 easily passed muster under rational basis review, id.

---

[8]     This court also affirmed the district court's holding that the Secretary of the Treasury and Governor were entitled to qualified immunity in their personal capacities and affirmed the district court's rejection of various of plaintiffs' other claims, including its equal protection claim. García-Rubiera v. Calderón, 570 F.3d 443, 461 (1st Cir. 2009). We ordered certification of plaintiffs' class action. Id.

at 186, and additionally denied plaintiffs' evidentiary requests. The court granted defendants' motion for summary judgment.

## II.

Plaintiffs appeal the district court's decision as to all their claims.  Our review of the district court's disposition of plaintiffs' legal claims is de novo, Rodriguez v. Am. Int'l Ins. Co. of P.R., 402 F.3d 45, 46-47 (1st Cir. 2005); our review of the court's denial of plaintiffs' evidentiary requests is for abuse of discretion, Doe v. Solvay Pharm., Inc., 153 Fed. App'x 1, 1-2 (1st Cir. 2005) (per curiam).

A.       Procedural Due Process Claim

Plaintiffs argue that Law 230 and its companion regulations deprive them of their property interests in the duplicate premiums without constitutionally adequate process.  To establish a procedural due process claim under § 1983, plaintiffs must demonstrate that they have "a property interest as defined by state law" and that the defendants deprived them of this property interest without constitutionally adequate process.  SFW Arecibo, Ltd. v. Rodríguez, 415 F.3d 135, 139 (1st Cir. 2005) (quoting PFZ Properties, Inc. v. Rodriguez, 928 F.2d 28, 30 (1st Cir. 1991)).

1.       Deprivation of a Property Interest

In García-Rubiera v. Calderón, 570 F.3d 443, this court held that plaintiffs have a property interest in their duplicate premiums both before and after the premiums are transferred from

JUA to the Treasury Department, id. at 455, and remanded for a determination as to whether Law 230 and its companion regulations effect a deprivation of plaintiffs' property for purposes of the Due Process Clause, id. at 458.

The district court held that because Law 230 and its amendments merely substitute one custodian of the duplicate payments for another, and replace one reimbursement procedure with another, they do not "deprive" plaintiffs of any property interests in the funds. García-Rubiera v. Fortuño, 752 F. Supp. 2d at 187. The court also rejected plaintiffs' argument that the Commonwealth's reimbursement procedure is too burdensome. Id. We disagree with the first holding, and agree as to the second.

Law 230 and its companion regulations, viewed in the full context of the Commonwealth's compulsory insurance scheme, clearly effect a deprivation of property for purposes of due process analysis.

Law 253 contemplates and empowers the Insurance Commissioner to establish a system to exempt privately-insured vehicle owners from paying duplicate state fees for insurance. P.R. Laws Ann. tit. 26, § 8061(b); see also Act No. 94 of Aug. 20, 1997, Statement of Motives, § 12. However, the Insurance Commissioner has chosen not to establish a reliable method for exempting insureds from the fees up front, but has chosen to rely on a reimbursement scheme, at least as to some insureds.

-19-

Specifically, the Commissioner has instituted a "Certificate of Compliance" process for avoiding payment of duplicate fees. See Amendment to Regulation No. 5737 (Sept. 14, 2000). However, by the Commonwealth's own admission, this process is not available to all insureds,[9] and plaintiffs have presented evidence that many, if not most, insureds pay twice. Insureds who do not obtain a Certificate of Compliance are forced to pay the Commonwealth's duplicate fees or suffer serious sanctions, including the impounding of their license plate, revocation of their driving privileges for the vehicle in question, and imposition of a misdemeanor charge and fine. P.R. Laws Ann., tit. 26, §§ 8053, 8060.

Thus, instead of determining whether insureds actually owe the state fees, in many cases the Commissioner simply charges insureds automatically for the state insurance product, and relies on a refund process for returning moneys paid but not actually owed to the state.

---

[9] As discussed above, whether an insured can obtain a certificate depends on, among other things, his or her timing in purchasing or renewing his or her insurance policy. If an insurance policy is altered or renewed within one and a half months of an insured's vehicle registration renewal date, JUA will not issue a certificate at all. See Amendment to Regulation No. 5737 (Sept. 14, 2000). Further, the record reveals that even when Certificates of Compliance are issued, only a fraction of these are successfully redeemed. In 2000, for example, approximately 33% of issued certificates were successfully redeemed by insureds. The Commonwealth does not currently provide any pre-payment procedures other than the certificate of compliance for avoiding the duplicate fees.

Although the Commissioner could have established a broader pre-payment exemption process, or given insureds information about the refund process at the time they make the duplicate payments, the Commissioner has chosen to rely on a post-payment refund application process for returning plaintiffs' money. Under these conditions, the Commonwealth has an obligation to set up a meaningful procedure for reimbursement, which includes adequate notice of the procedure.

The Commonwealth does not contest its obligation to return plaintiffs' money upon a proper application for refund. The lawfulness of the Commonwealth's initial duplicate collection of the payments does not insulate it from providing meaningful procedures for the return of property that is rightfully plaintiffs', and as to which the Commonwealth has no valid claim prior to escheat. See City of West Covina v. Perkins, 525 U.S. 234, 240 (1999) ("At this stage, no one contests the right of the State to have seized the property in the first instance or its ultimate obligation to return it. So rules restricting the substantive power of the State to take property are not implicated by this case.").

The Supreme Court has held in the tax context that "[i]f a State places a taxpayer under duress promptly to pay a tax when due and relegates him to a postpayment refund action in which he can challenge the tax's legality, the Due Process Clause . . .

-21-

obligates the State to provide meaningful backward-looking relief." McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, 496 U.S. 18, 31 (1990). In such circumstances, a state must ensure that its tax scheme comports with due process.

The right focal point for the due process deprivation analysis is thus not on the moment of transfer of funds from the custody of JUA to that of the Commonwealth, but on the overriding obligation of the Commonwealth, throughout the total process, to provide notice and a meaningful procedure to return to plaintiffs the property that is rightfully theirs. That plaintiffs have two years in which to seek a refund from JUA before the funds are transferred does not obviate the Commonwealth's independent obligation to provide a meaningful refund procedure after the funds have been transferred and before their final escheat. See Jones v. Flowers, 547 U.S. 220, 232-33 (2006).

### 2.    What Process is Due?

Plaintiffs make two basic procedural due process arguments that the refund process provided by the Commonwealth is inadequate under the Due Process Clause. The first is that they have not been given adequate notice as to what procedures are available or from whom they should obtain reimbursement. This encompasses the argument that they have not been given notice that the funds have been transferred from JUA to the Commonwealth. The second argument is that the Commonwealth's application process for

-22-

reimbursement of individual requests is too burdensome. We take each argument in turn.

As to plaintiffs' first argument, it is true that the requirements of due process vary with the particulars of the circumstance at issue. See Morrissey v. Brewer, 408 U.S. 471, 481 (1972); Boddie v. Connecticut, 401 U.S. 371, 378 (1971). One such variation turns on whether the government conduct affecting the protected property interest is legislative or adjudicative in nature. This is often put in terms of two poles, with a continuum in between. At one end is legislative action. Where property is affected by generally-applicable legislative action, property owners are not entitled to notice above and beyond the notice provided by the enactment and publication of the statute. See, e.g., United States v. Locke, 471 U.S. 84, 108 (1985); Bi-Metallic Inv. Co. v. State Bd. of Equalization, 239 U.S. 441, 445 (1915). At the other end are individual adjudications, which require more specific procedures, see, e.g., Mathews v. Eldridge, 424 U.S. 319, 335 (1976), as well as more specific notice, see Dusenbery v. United States, 534 U.S. 161, 167-68 (2002); Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). In our previous opinion in this case, we cited to Mullane for the scope of due process notice guarantees, implicitly recognizing that this case is not at the legislative end. García-Rubiera v. Calderón, 570 F.3d at 456-57.

The Commonwealth argues that this is a case of clear statutory notice. That is plainly not so, since Law 230 gives no notice to insureds of how to obtain reimbursement; it merely directs the Secretary of the Treasury to "establish a procedure for processing the reimbursement request from any person." P.R. Laws Ann. tit. 26, § 8055(*l*). This administrative procedure, in turn, cannot be found in any readily available publication or online, and even if insureds go to the Treasury Department in person, they will not find the regulations. This is not the notice due insureds, and on this basis alone, this scheme is constitutionally deficient.

However, plaintiffs' argument that Procedure 96 is like a full adjudicatory hearing is also not fully accurate. But plaintiffs are not entirely off the mark. Procedure 96 falls along the continuum between legislative and adjudicative action. Thus, we do not say that the procedural due process inquiry ends if the Commonwealth, today, were to publish the terms of Procedure 96 online and/or in some other publically available source. Rather, we turn to useful analogies for guidance on what form of notice will satisfy the Commonwealth's obligations under the Due Process Clause to give notice to insureds of the administrative procedure for reimbursement.

i.    The Commonwealth Has Not Established Legislative Notice

We explain why we reject the Commonwealth's argument that plaintiffs have been provided with adequate legislative notice of the procedures for reimbursement.

In some circumstances, the publication of clear, reasonably comprehensible regulations publically available in hard copy and/or online may suffice to provide adequate notice of the procedures for reclaiming property.  In City of West Covina v. Perkins, for example, the Supreme Court held that although government agents must give notice to property owners that their property has been taken "so that the owner[s] can pursue available remedies for [the] return" of their property, individualized notice of the remedies for return is not required where those remedies are "established by published, generally available state statutes and case law."  525 U.S. at 240-41.  The Court held that property owners can turn to these readily available "public sources" for specific instructions on how to reclaim their property.  Id. at 241; see also Reetz v. Michigan, 188 U.S. 505, 509 (1903) (holding that when a statute clearly fixes the time and place of meeting of a permitting board or tribunal, additional notice to persons wishing to attain a permit may not be required).

However, the principle of legislative notice does not extend to regulations that are not publically available.  See, e.g., City of West Covina, 525 U.S. at 242 ("[N]otice of the

-25-

procedures for protecting one's property interests may be required when those procedures are arcane and are not set forth in documents accessible to the public." (discussing Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1 (1978))); Butler v. Castro, 896 F.2d 698, 703 (2d Cir. 1990) (holding that where New York City's procedures for returning seized property were contained in an unpublished judicial order, and not reflected in the most updated version of the municipal code, the City failed to demonstrate legislative notice and the administrative scheme violated the basic notice requirements of the Due Process Clause).

In the present case, the Commonwealth's notice falls below the standard for legislative notice. The Puerto Rico statutes do not give any notice of the Commonwealth's reimbursement procedures. Law 230 merely directs the Secretary of the Treasury to "establish a procedure for processing the reimbursement request from any person." P.R. Laws Ann. tit. 26, § 8055(l) (emphasis added). The Treasury Department's "procedure for processing reimbursement," Procedure 96, has not been published in hard copy or online and is not readily available to the public.

As the Attorney General of Puerto Rico has admitted, once the Secretary of the Treasury formulated Procedure 96, the Commonwealth took only the following two actions. First, the Secretary of the Treasury submitted the regulation to the Secretary of State, who published a "summary" of the regulation "in two

newspapers of general circulation", "including its number, its effective date and the agency that approved it." No information has been provided as to when or where these summaries were published, their content, or where an insured might search to obtain this information. Second, the Secretary of State retained a copy of the regulation in an office, for public inspection upon a proper request. The regulation is thus not readily available online or in other publically accessible hard copy sources or databases. Nor would insureds know to look for the regulation at the office of the Secretary of State instead of the Treasury Department.

Moreover, neither Law 230 nor any of its companion regulations require private insurance companies or JUA to provide insureds with notice of the Commonwealth's reimbursement process. Although there is evidence that some private insurance companies may have informed insureds of the proper procedures for obtaining reimbursement through the Treasury Department, there is ample evidence that many insurance companies have not provided their insureds with any information whatsoever concerning the existence or particulars of Procedure 96.

Absent a trip, in person, to the appropriate office of government and a proper request to inspect the regulation, the Commonwealth has left plaintiffs in the dark as to every aspect of

Procedure 96. The Commonwealth's statutory notice argument thus fails.

### ii. What Notice Is Required?

Plaintiffs argue that the Commonwealth's reimbursement procedure constitutes an individual adjudication to which the full array of procedural due process protections attach. This is not entirely accurate either. The Commonwealth's reimbursement scheme falls somewhere in between legislative action and individual adjudications.

As courts have recognized, the line between legislative and adjudicative action for purposes of procedural due process analysis is not always easy to draw. See United States v. Fla. E. Coast Ry. Co., 410 U.S. 224, 245 (1973) ("[T]he line dividing them may not always be a bright one . . . ."); L C & S, Inc. v. Warren Cnty. Area Plan Comm'n, 244 F.3d 601, 603 (7th Cir. 2001) ("[T]he line between legislation and adjudication is not always easy to draw . . . ."); Thomas v. City of New York, 143 F.3d 31, 36 n.7 (2d Cir. 1998) (examining whether the government action at issue "[is], in fact, fully legislative or, at least in part, adjudicative"); see also Gallo v. U.S. Dist. Court For The Dist. of Ariz., 349 F.3d 1169, 1182 (9th Cir. 2003); 75 Acres, LLC v. Miami-Dade Cnty., Fla., 338 F.3d 1288, 1296 (11th Cir. 2003).

More importantly, not all government actions fall neatly into these polar categories. As with the requirements of due

process in general, the "'notice required will vary with circumstances and conditions.'" Jones, 547 U.S. at 226 (quoting Walker v. City of Hutchinson, 352 U.S. 112, 115 (1956)). A complex administrative scheme, like the one challenged in this case, may contain both legislative elements -- the application of a general rule to a large number of people -- as well as adjudicative elements -- fact-specific determinations of rule compliance in individual instances. See Texaco, Inc. v. Short, 454 U.S. 516, 534-36 (1982) (contrasting the lapse of a mineral interest as provided for by statute with an adjudicative determination as to whether that interest has in fact lapsed and if so, to whom, which requires individualized notice).

In this case, the Secretary of the Treasury has instituted an individualized process for evaluating and processing specific claims for reimbursement. Under Procedure 96, the Treasury Department must grant or deny individual claims for reimbursement from both individuals and private insurance companies, verifying in each instance that the claimant has paid the compulsory premium, has purchased valid alternative insurance for the coverage period, has not been reimbursed by a private insurer or by the Treasury Department, and has submitted proper documentation for each claim. Where the claimant is an insurance company, the Treasury Department must verify additional facts,

including that the company has not yet received reimbursement from JUA.

Significantly, all claimants must additionally demonstrate that they do not owe any taxes to the Commonwealth. The regulation provides that if a claimant has any tax debts, the Treasury Department "shall inform the Collections Bureau to apply this amount to the debt." P.R. Dep't of Treasury, Procedure 96 (Apr. 1, 2003). This appears to be an attempt to give the Commonwealth a priority right to set off any purported tax debt against the reimbursement owed. Further, there are no instructions as to what an insured should do if he or she disputes the tax debt. There is, moreover, no mention of further steps that may be taken when claims generally are denied by the Treasury Department. However, plaintiffs do not specifically complain about the tax set off procedure or the absence of an appeals process.

Procedure 96 thus has elements of an individualized adjudicative process. As a consequence, more than statutory notice is required. We have found no Supreme Court case on point, but we do find useful analogies in a variety of other contexts, including seizure and forfeiture, unclaimed property laws, and tax refund laws, in which courts have analyzed what process is required when, after taking property belonging to others, the government sets up some form of claims process for returning that property to its rightful owners.

-30-

In one analogous situation, the Second Circuit has held in a series of cases that New York City's procedure for returning property seized from arrestees failed to meet the minimum due process requirements for notice. Under the City's original forfeiture procedure, property seized from arrestees could be disposed of without any individualized notice to the property owners. In McClendon v. Rosetti, 460 F.2d 111 (2d Cir. 1972), the Second Circuit struck down this procedure for the first time, holding that the City's practice of releasing or forfeiting property seized from arrestees without providing any meaningful individualized notice to the owners of that property violated the notice requirements of the Due Process Clause. Id. at 114-115. Later, in Alexandre v. Cortes, 140 F.3d 406 (2d Cir. 1998), the court held that the City's procedures continued to violate due process where they failed to provide any notice or procedure for resolution of disputes concerning the ownership of property prior to releasing the property to a lienholder. See also Frith v. Hill, No. 07-5899, 2009 WL 3073716, at *5 (S.D.N.Y. Sept. 23, 2009) (rejecting City's argument that arrestee had notice of the procedures for recovery of his property).

In these cases, although the plaintiffs typically knew that their property had been seized, the City did not provide any notice to the plaintiffs of the existence or specifics of procedures for reclaiming property. The Second Circuit held that

-31-

the City must provide the plaintiffs with that information, on an individualized basis, to meet the basic notice requirements of due process.  See Alexandre, 140 F.3d at 412-13; cf. United States v. James Daniel Good Real Prop., 510 U.S. 43, 53 (1993) (requiring notice and a hearing before proceedings for forfeiture of real property in order "to protect [the individual's] use and possession of property from arbitrary encroachment -- to minimize substantively unfair or mistaken deprivations of property") (quoting Fuentes v. Shevin, 407 U.S. 67, 81 (1972)).

Courts have also required individualized notice in the context of unclaimed property laws.  See Taylor v. Westly, 488 F.3d 1197 (9th Cir. 2007) (issuing preliminary injunction against the operation of California's Unclaimed Property Law, under which California seized dormant property from known persons and then placed that property in a custodial trust ad infinitum or until the property was reclaimed by owners without individualized notice at any point, and holding that California must provide individualized notice of seizure to property owners); Taylor v. Westly, 402 F.3d 924 (9th Cir. 2005) (finding Eleventh Amendment did not bar plaintiffs' claims).

The Supreme Court has also held in the due process notice context that "a party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation." Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 799

-32-

(1983).  Significantly, in Jones v. Flowers, the state argued that an owner has "inquiry" notice that her property may be subject to forfeiture if she fails to receive a property tax bill and fails to pay property taxes.  547 U.S. at 231-32.  Recognizing that it is "common knowledge that property may become subject to government taking when taxes are not paid," the Supreme Court nevertheless held that "inquiry" notice "does not excuse the government from complying with its constitutional obligation of notice."  Id. at 232.  Where a state affords a person "the right to settle accounts with the State and redeem his property," the state must provide constitutionally adequate notice even to citizens who fail to take the initiative to inquire about their property.  Id. at 233.  In Jones, the Court held that adequate notice for the tax forfeiture of a person's home required personalized notice mailed to the homeowner's last known address, and additional reasonable steps toward notification where this mailed notice was returned unclaimed.  Id. at 234.

These cases have all required the government to provide some form of individualized notice where the government has in its possession property belonging to others, and where it has instituted a claims process or other form of individualized adjudication for returning or disposing of this property.  In some cases, the property owners knew or should have known that the state had possession of their property, see, e.g., Jones, 547 U.S. at

231-32; Butler, 896 F.2d at 699, and in all of the cases, the government placed the impetus upon the property owners to reclaim their property, see, e.g., Jones, 547 U.S. at 233; Taylor, 402 F.3d at 927; Butler, 896 F.2d at 699.

In the present case, much like in the cases described above, the Commonwealth has set up a claims process for property that it has exacted from insureds, but provides individual insureds with no information about how to reclaim their property.

We hold that under these conditions the Commonwealth is required to give individual notice to insureds owed reimbursement to the maximum extent feasible. On remand, the district court can resolve any factual issues as to feasibility.

Plaintiffs have produced some evidence that the Commonwealth keeps current a list of the names of insureds, their addresses, and other identifying information, and thus, could easily provide individualized notice. The Commonwealth disputes this, at least in part. If, in fact, the Commonwealth has the names and addresses of those insureds owed reimbursement, or can obtain that information readily, then it must send individualized notice. If it has in its possession, or can readily obtain, only the names, but not addresses, of insureds owed reimbursement, it must publish that list of names online and in other places readily accessible by the public. If the Commonwealth does not have any way to determine the identities or addresses of those insureds owed

-34-

reimbursement, it must arrange to obtain this information -- either from JUA or from the private insurance companies -- and must subsequently provide individualized or publication notice.

This notice must include notice of the transfer of funds from JUA to the Commonwealth, of Procedure 96, and of Law 230's escheat provisions, and must be provided either individually or via publication, to those insureds whose duplicate premiums are currently or will be in the possession of the Commonwealth.  In addition, the Commonwealth must publish Procedure 96, in full, online and in other places readily accessible by the public.

B.      Plaintiffs' Other Federal Claims Fail

Plaintiffs raise three additional constitutional claims, all of which fail.  First, plaintiffs argue that the Takings Clause prohibits the Commonwealth from collecting and asserting custody over the duplicate payments because no legitimate purpose is fulfilled by the Commonwealth's scheme.  Plaintiffs characterize Law 230 and its Amendments as a "forced loan" imposed on plaintiffs by the Commonwealth in "an illegitimate use of government powers" to "cover[] its budget shortfall."

Although plaintiffs raise this claim under the Takings Clause, and rely on the Supreme Court's decision in Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005), as the Court explained in that case, such a challenge to the underlying validity of a regulation "is logically prior to and distinct from the question

whether a regulation effects a taking."  Id. at 543.  The Takings Clause does not prohibit government from interfering with property rights, but rather requires just compensation for an "otherwise proper interference amounting to a taking."  Id. (emphasis added) (quoting First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles, 482 U.S. 304, 315 (1987)).

Plaintiffs' grievance is with what they characterize as the Commonwealth's "misuse" of governmental powers.  They argue that "[t]he takings clause cannot be used to obtain forced loans from citizens even if the government institutes a fair repayment procedure."  (Emphasis added).

Plaintiffs thus have mischaracterized what is in fact a substantive due process claim as a takings claim.  Plaintiffs' argument that the Commonwealth's purpose in collecting and retaining custody over the duplicate payments "is not legitimate" is an argument that goes to the core of substantive due process law.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998) ("We have emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government,' whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." (internal citations omitted)).  Plaintiffs

concede as much at points in their "takings" argument, in which they rely heavily on substantive due process law.

We reject this attempt by plaintiff to cast their due process claim as an independent takings claim. If plaintiffs have another theory of takings, they have not clearly articulated it and we deem their takings claim waived.

However, plaintiffs do raise an independent substantive due process challenge to the compulsory insurance reimbursement scheme, which we now address. Plaintiffs argue that Law 230 and its amendments are so arbitrary and illegitimate as to violate the substantive component of the Due Process Clause.

We reject this challenge to the underlying validity of the compulsory insurance scheme. It is not unconstitutional for the Commonwealth to charge plaintiffs the duplicate fees upfront in order to guarantee coverage, and thereafter take custody of the payments, provided that the Commonwealth also implements a meaningful notice and refund process that complies with due process.

Plaintiffs also argue that the burdens Procedure 96 imposes on individual claimants constitutes a separate violation of procedural due process. The district court rejected this argument finding that plaintiffs failed to demonstrate on the facts that Procedure 96 was excessively burdensome under the Due Process

Clause.  García-Rubiera v. Fortuño, 752 F. Supp. 2d at 187.  We agree with the district court.

We also reject plaintiffs' remaining claims and, reviewing for abuse of discretion, Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 186 (1st Cir. 1989), affirm the district court's decisions denying plaintiffs' request for disclosure of a sealed agreement between JUA and the Commonwealth and request to deem certain facts presented by plaintiffs as conceded by the Commonwealth.  García-Rubiera v. Fortuño, No. 3:02-cv-01179 (Sept. 14, 2010).

C.      The Puerto Rico Litigation Concerning the Commonwealth's Fiduciary Duties

Law 230 directs the Commonwealth to take into trust property belonging to plaintiffs for a statutorily prescribed period, during which it is required to administer that trust.  P.R. Laws Ann. tit. 26, § 8055(*l*).  The Commonwealth's status as trustee over the funds was conceded by all the parties in this case, and has been recognized repeatedly by both the district court and this court over the course of this litigation, see García-Rubiera, 570 F.3d at 452 ("Furthermore, upon transfer to the Secretary, Law 230 requires the Secretary to hold the duplicate premiums in a fiduciary capacity." (citing P.R. Laws Ann. tit. 26, § 8055(1) ("The Secretary of the Treasury shall retain these funds as trustee . . . ."))); id. (comparing the funds entrusted to the Commonwealth to "funds held in trust in an IOLTA account or an interpleader

-38-

account"); García-Rubiera, 752 F. Supp. 2d at 184, 188-89; García-Rubiera, 516 F. Supp. 2d at 191 n.14 ("Therefore, it appears that the trust continues even after the Secretary has transferred the money to the General Fund."); id. at 198 (directing the Commonwealth to cease its acquisition of any interest accrued on the duplicate payments).

The fact that the Commonwealth holds the funds in trust presents several important questions of the possible breach of fiduciary duties under Puerto Rico trust law, as to the notice requirements for fiduciaries, the complexity and burdens of the refund procedure, and its tax set off provision. We leave to the Puerto Rico courts the question of whether the particulars of Procedure 96 violate the Commonwealth's fiduciary duties to plaintiffs under Puerto Rico trust law.

III.

In summary, we affirm the district court's rejection of plaintiffs' substantive due process claim and procedural due process burdensomeness claim and reject plaintiffs' takings claim. We also affirm the district court's denial of plaintiffs' evidentiary requests.

We reverse the district court's rejection of plaintiffs' notice claim, and direct the court to enter a declaratory judgment in favor of plaintiffs that the Commonwealth's reimbursement scheme, as embodied in Law 230 and its companion amendments and

regulations, violates the notice requirements of the Due Process Clause.  We further direct the district court to enter injunctive relief requiring the Commonwealth to provide adequate public notice, as well as individualized notice to those insureds owed reimbursement, of the Commonwealth's procedures for reimbursement, consistent with this opinion.

We remand to the district court for entry of declaratory and injunctive relief consistent with this opinion.

So ordered.  Costs are awarded to plaintiffs.